# United States Court of Appeals
## For the First Circuit

No. 23-1531

B.R.S. REAL ESTATE, INC.,

Plaintiff, Appellant,

v.

CERTAIN UNDERWRITERS AT LLOYD'S, LONDON SUBSCRIBING TO POLICY
NUMBER QMF1760087; QUAKER SPECIAL RISK; LAMARCHE ASSOCIATES,
INC.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. John J. McConnell, Jr., U.S. District Judge]

Before

Kayatta, Lipez, and Gelpí,
Circuit Judges.

Nicole M. Labonte, with whom Law Offices of Richard Palumbo,
LLC was on brief, for appellant.
William A. Schneider, with whom Richard R. Hennessey and
Morrison Mahoney LLP were on brief, for appellees.

August 12, 2024

**KAYATTA**, **Circuit Judge**.  This appeal arises out of a dispute over the amount of an insurance award owed to B.R.S. Real Estate, Inc. for water damage to its commercial warehouse.  B.R.S. challenges the appraisal decision issued by a panel of two party-appointed appraisers and a neutral umpire.  B.R.S. also contends that the district court erred in granting summary judgment on its claim that defendants breached the terms of the insurance contract by refusing to pay B.R.S. $141,787.33 in withheld depreciation.  For the following reasons, we affirm the district court's judgment and decline to vacate the appraisal award.

## I.

On review of the district court's decision on summary judgment, we accept the facts in the light most favorable to B.R.S. as the nonmoving party and draw all reasonable inferences on its behalf.  See Ciarametaro v. City of Gloucester, 87 F.4th 83, 85 (1st Cir. 2023).

B.R.S. owns a commercial property located at 820-824 Main Street, West Warwick, Rhode Island (the "Property").  From 1974 to 1994, the Property housed a grocery store.  It then sat vacant until 2017, when B.R.S. entered into a commercial lease with DC 88 Express, Inc., to convert the building into a grocery warehouse.

B.R.S. insured the Property under a policy (the "Policy") issued by Certain Underwriters at Lloyd's, London and

managed by Quaker Special Risk (collectively, the "Insurers"). In 2018, the pipes at the Property froze and burst, causing extensive damage to the building. B.R.S. filed a claim for insurance coverage under the Policy, invoking its "Loss Payment" provision, pursuant to which:

> In the event of loss or damage covered by this Coverage Form, at [the Insurers'] option, [the Insurers] will either:
>
> (1) Pay the value of lost or damaged property;
>
> [or]
>
> (2) Pay the cost of repairing or replacing the lost or damaged property . . . .

The Policy's "Valuation Condition" specified that the Insurers would "determine the value of Covered Property in the event of loss or damage . . . [a]t actual cash value as of the time of loss or damage."

B.R.S. retained Douglas Soscia of RI Adjusting Services as its public insurance adjuster for the claim. The Insurers retained Rebecca Girouard from LaMarche Associates as their loss adjustment investigator.

With the Insurers' consent, B.R.S. hired a contractor to perform initial remediation work on the Property. After initial remediation was completed, the Insurers sent engineers from The Vertex Companies, Inc. ("Vertex") to inspect the Property and draw up an estimate for the total value of the loss claim. On behalf

of the Insurers, Girouard issued a preliminary replacement cost estimate of $165,846.49 plus remediation expenses of $23,196.28. Soscia responded on behalf of B.R.S. with an estimate totaling $464,505.03. The Insurers then issued a $141,027.11 payment to B.R.S., which reflected the undisputed portion of the claim.

With the parties unable to reach an agreement as to the remaining amount, B.R.S. demanded an appraisal under the terms of the Policy, which provided that:

> If [the Insurers] and [B.R.S.] disagree on the value of the property or the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the value of the property and amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding.

The Insurers requested time before the appraisal to evaluate the electrical portion of B.R.S.'s claim. B.R.S. agreed and Soscia followed up with an additional estimate for repairs, bringing B.R.S.'s total claim to $1,168,624.12. Girouard advised Soscia that she would also have to review this supplemental estimate, and hired James Boudreau, a building consultant working for Vertex, to assess the additional claims.

B.R.S. then sent a second demand for an appraisal, to which the Insurers acquiesced. The Insurers chose Boudreau as their appraiser, and B.R.S. chose John Zarlenga of Adrien & Son. Neither party voiced any objections to these selections at that time. Zarlenga and Boudreau then selected William Monahan of Monahan & Associates, P.C. to serve as the umpire.

Following an inspection by the appraisers and a series of back-and-forths between Soscia and Girouard, the umpire, Monahan, and the Insurers' appraiser, Boudreau, signed on to an appraisal award on August 15, 2019 as follows:

- $445,010.48 for replacement cost loss;
- Minus $92,746.51 for withheld depreciation;
- For a total actual cash value loss of $352,263.97;
- Plus additional coverage of $10,000 for increased cost of construction.

Zarlenga did not sign the award. The Insurers then issued a supplemental payment to B.R.S. for $208,736.86.

Soscia subsequently notified defendants that the initial appraisal award failed to account for the replacement cost value of certain materials and appliances. Monahan then issued an amended award as follows:

- $516,067.89 for replacement cost loss;
- Minus $141,787.33 for withheld depreciation;
- For a total actual cash value loss of $374,280.56;

- Plus additional coverage of $10,000 for increased cost of construction.

Boudreau signed the amended award; Zarlenga again did not. On March 16, 2020, the Insurers issued a final payment for $34,516.59 to B.R.S. This brought the total amount paid by the Insurers to B.R.S. to $384,280.56, the value of the appraisal award less depreciation, plus $10,000 in additional construction costs.

At some point in early 2020, B.R.S. sent an "Invoice/Letter of Completion" to the Insurers advising that Soscia Construction, Ltd. had "completed the first phase (rough) and the second phase required for [] repair" of the Property. It gave a "total estimate for the repairs" of $975,000, $650,000 of which was "due through phase 2." B.R.S. argued that this invoice triggered the Insurers' obligation to pay the $141,787.33 in withheld depreciation under the amended appraisal award. The Policy did indeed call for the payment of the full replacement cost without any deduction for depreciation, but only subject to the following conditions:

> [The Insurers] will not pay on a replacement cost basis for any loss or damage:
>
> (1) Until the lost or damaged property is actually repaired or replaced; and
>
> (2) Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage.

So the Insurers did not owe B.R.S. the withheld depreciation unless and until B.R.S. actually repaired or replaced the Property.

B.R.S. argues that it satisfied this condition precedent when it sent the Insurers the invoice from Soscia Construction showing that it had completed the first two phases of repair on the Property. When Girouard met with Soscia to confirm that the Property had indeed been repaired, however, she found that the main level of the Property had been converted to a laundromat. The Insurers thereby declined to pay the withheld depreciation, arguing that the Policy only obligated them to pay on a "Replacement Cost" basis if B.R.S. actually replaced the Property with other property of similar use.

B.R.S. filed suit against defendants in Rhode Island state court. The complaint alleged that the appraisal award was invalid because Boudreau was not an "impartial" appraiser as required by the Policy, and stated four causes of action: (1) petition for a complete, proper, and impartial appraisal; (2) breach of contract for failing to appoint an impartial appraiser and for subtracting the value of depreciation from the final award amount; (3) declaratory judgment that B.R.S.'s "full" claim is covered; and (4) unfair claims settlement practices and bad faith for use of a biased appraisal process and reliance upon an invalid appraisal award.

Defendants removed the case to federal court and moved to confirm the appraisal award. The court denied the motion without prejudice, explaining: "This matter is not ripe for adjudication. Discovery has not yet taken place. This mat[t]er cannot be decided in the infancy stage of this litigation. The Plaintiff's complaint, which the Court considers true for purposes of this motion, states a valid and plausible claim upon which relief could be granted." The court also denied defendants' subsequent motion for reconsideration.

In due course, defendants filed a motion for summary judgment and to confirm the appraisal award. The court granted summary judgment for defendants. B.R.S. Real Est., Inc. v. Certain Underwriters at Lloyd's, London, 682 F. Supp. 3d 204 (D.R.I. 2023). It concluded that, on the record before it, no reasonable jury could conclude that Boudreau was an impermissibly biased appraiser or that Monahan was an incompetent umpire. Id. at 208-12. This appeal follows.

## II.

B.R.S. first contends that the law-of-the-case doctrine precluded the district court from granting defendants' renewed motion to confirm the appraisal award. "The law-of-the-case doctrine generally provides that 'when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'" Musacchio v. United States,

- 8 -

577 U.S. 237, 244-45 (2016) (quoting Pepper v. United States, 562 U.S. 476, 506 (2011)). And so, B.R.S. argues, having denied defendants' previous motions to confirm the arbitration award, the district court could not then grant the renewed motion on summary judgment.

But the district court based its previous denials on the fact that "[d]iscovery ha[d] not yet taken place" and therefore the issue was "not ripe for adjudication." It noted that the complaint, "which the Court consider[ed] true for purposes of" the motions, "state[d] a valid and plausible claim upon which relief could be granted." In contrast, discovery had concluded when the Insurers later filed their renewed motion to confirm the appraisal award in conjunction with their motion for summary judgment. And the district court correctly applied the summary judgment standard in its decision, asking whether there remained any "genuine dispute as to any material fact" and whether defendants were "entitled to judgment as a matter of law." B.R.S. Real Est., Inc., 682 F. Supp. 3d at 206 (quoting Fed. R. Civ. P. 56(a)). In short, the district court's first ruling merely held that the complaint's allegations made it plausible that the yet-to-be-evidenced facts might support a ruling for B.R.S., while the subsequent ruling held that the evidence that was actually supplied turned out not to provide that support.

B.R.S. next argues that the district court erred in declining to vacate the appraisal award based on Boudreau's preexisting business relationship with the Insurers, which B.R.S. claims rendered him an impermissibly partial appraiser.

In challenging the appraisal award, B.R.S. faces an uphill battle. Rhode Island state law grants "arbitration awards . . . a strong presumption of validity given the 'strong public policy in favor of the finality of arbitration awards.'" Pierce v. R.I. Hosp., 875 A.2d 424, 426 (R.I. 2005) (quoting Prudential Prop. & Cas. Ins. Co. v. Flynn, 687 A.2d 440, 441 (R.I. 1996)). Under Rhode Island law, a court "must make an order vacating [an arbitration] award . . . [w]here there was evident partiality or corruption on the part of the arbitrators, or either of them." R.I. Gen. Laws § 10-3-12(2).[1] "[E]vident partiality" exists where "a reasonable person would have to conclude that an arbitrator was partial to one party to the arbitration." V.S. Haseotes & Sons, L.P. ex rel. Bentas v. Haseotes, 819 A.2d 1281, 1285 (R.I. 2003) (quoting Aetna Cas. & Sur. Co. v. Grabbert, 590 A.2d 88, 96 (R.I. 1991)). It "requires a showing of more than an

---

[1] The Rhode Island Supreme Court has clarified that an appraisal process involving two party-appointed appraisers and a disinterested umpire is in substance an arbitration proceeding, and therefore subject to the same standards of review. See Waradzin v. Aetna Cas. & Sur. Co., 570 A.2d 649, 650 (R.I. 1990).

appearance of bias but less than actual bias." Id. (quoting Grabbert, 590 A.2d at 96). The party challenging the award "bears '[t]he burden of proving facts that would establish a reasonable impression of partiality.'" Id. (quoting Taylor v. Delta Electro Power, Inc., 741 A.2d 265, 267 (R.I. 1999) (per curiam)).

B.R.S. points out that the Insurers had previously retained Boudreau to appraise the Property and assess B.R.S.'s supplemental claims. It argues that Boudreau's familiarity with the Property, as well as his earlier work with the Insurers, biased him during the appraisal process. But B.R.S. knew well before the appraisal began that the Insurers had previously retained Boudreau to reinspect the Property. And Rhode Island's highest court has expressly refused to "adopt a procedure in which a losing party may make a post-decision challenge to an arbitrator's neutrality based upon information that, with the exercise of diligence, ought to have been discovered before the proceedings commenced." Haseotes, 819 A.2d at 1286. So, too, here, B.R.S. cannot debut its challenge to Boudreau post-decision.

B.R.S. next takes aim at the credentials of the umpire, Monahan. It argues that because Monahan is a lawyer without specific construction knowledge or an understanding of what is required to repair a commercial building like the Property, he was not a "competent" umpire under the terms of the Policy. Nor, B.R.S. adds, would a competent umpire have "permitted" Girouard

- 11 -

and Soscia to be so heavily involved in the appraisal process, treating the process as a "free for all" settlement between the parties.

The simple rejoinder is that, once again, B.R.S. seeks a redo based on information that it had before the appraisal was undertaken. Indeed, B.R.S.'s appointee helped pick the umpire. That B.R.S. now claims to have second thoughts provides no basis for challenging the award.

The longer rejoinder is that in the context of insurance awards, "it is not essential to competency that an arbitrator be an expert qualified to determine the submitted matters from personal knowledge and examination without the aid of the other evidence." 15 Couch on Insurance § 211.27 (3d ed. 2024). Instead, "an attorney, otherwise qualified, may act as an appraiser . . . even though he or she is not a contractor or architect." Id. By all standards, then, Monahan was fully capable of serving as an umpire for the parties' insurance dispute. Neither does B.R.S. cite to any authority beyond their say-so that allowing Soscia and Girouard to be involved in the appraisal process was improper or otherwise led to an award that "substantially prejudiced" the rights of any party. See R.I. Gen. Laws § 10-3-12(3). In sum, B.R.S.'s challenge to the umpire on his conduct is too little and too late.

B.R.S. separately argues that the district court erred in granting defendants' motion for summary judgment on its claim for breach of contract and breach of the implied duty of good faith and fair dealing.[2]  We review de novo a district court's grant of a motion for summary judgment.  Nantucket Residents Against Turbines v. U.S. Bureau of Ocean Energy Mgmt., 100 F.4th 1, 12 (1st Cir. 2024).  We affirm if we agree that "there is no genuine dispute as to any material fact" and defendants are therefore "entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Because under Rhode Island Law "the implied covenant of good faith and fair dealing does not create an independent cause of action but must be connected to a breach-of-contract claim," we dispose of both claims simultaneously.  Premier Home Restoration, LLC v. Fed. Nat'l Mortg. Assoc., 245 A.3d 745, 750 (R.I. 2021) (cleaned up) (quoting Ferreira v. Child & Fam. Servs., 222 A.3d 69, 76 (R.I. 2019)).

B.R.S. contends that the Insurers violated the terms of the Policy when they refused to pay the $141,787.33 in withheld depreciation listed in the amended award.  Recall that the Policy

---

[2]  The Policy's appraisal clause establishes only the procedure by which the Insurers and B.R.S. will resolve disagreements about the value of the lost property, and does not apply to disputes over the Insurers' obligation to pay under the terms of the Policy.

required the Insurers to pay the replacement cost of the Property including any costs for depreciation once B.R.S "actually repaired or replaced" the Property. B.R.S. argues that the receipt from Soscia Construction showing that the first two phases of construction had been completed on the Property satisfied this "actually repaired" requirement, thus triggering the Insurers' obligation to pay the withheld appreciation as assessed in the amended appraisal award.

> The Policy, though, further provided that the Insurers:
>
> [W]ill not pay more for loss or damage on a replacement cost basis than the least of[:]
>
> (1) The Limit of Insurance applicable to the lost or damaged property;
>
> (2) The cost to replace the lost or damaged property with other property:
>
> > (a) Of comparable material and quality; and
> > (b) Used for the same purpose; or
>
> (3) The amount actually spent that is necessary to repair or replace the lost or damaged property.

By the time Soscia sent the Insurers the invoice for repair work on the Property, the Insurers had already paid B.R.S. $384,280.56 on its insurance claim. At summary judgment, B.R.S. presented no evidence showing that "the least of" the three replacement-cost bases rang in at more than this sum. Most fatal to B.R.S. is the third such basis -- the amount "actually spent" to repair or

replace the Property. At summary judgment, B.R.S. offered as evidence three checks made out to Soscia Construction for repair work on the Property: two for $5,218.42, and one for $187,863.18. That comes to a total of $198,300.02, far less than the $384,280.56 already paid by the Insurers. As for the $975,000 invoice from Soscia Construction, the repair work turned the Property into a laundromat rather than a grocery space.[3] That precludes B.R.S. from claiming those expenditures as the cost to replace the Property with other property "[u]sed for the same purpose."[4]

**V.**

We therefore <u>affirm</u> the judgment of the district court.

---

[3] The invoice, moreover, does not show that B.R.S. actually paid Soscia Construction anything close to $975,000 -- only that Soscia Construction charged B.R.S. that amount.

[4] B.R.S. offers no evidence that it would have cost more than the Insurers paid to have replaced the property with a grocery warehouse.

- 15 -